United States v. Solvay Pharmaceuticals, Incorporated. Mr. Androffi. Thank you, Your Honors. May it please the Court. I would like to focus on three issues this afternoon. Number one, whether the District Court ignored well-developed, overwhelming evidence of a nationwide scheme to market the three drugs, Acyon, Buvox, and Androgel, off-label causing false claims and impacting Medicaid payment nationwide. Number two, whether the Court erred in excluding the claims data in the call notes. And three, whether the Court erred with regard to the original source and public disclosure requirements when it ignored the plain text of the false claims statute by reading into it an arbitrary, specific period of time before the filing. We proved, Your Honor, that Solvay had business plans that documented well efforts to market the drug off-label. We also proved we had evidence that they had marketing plans that documented strategies for an off-label marketing. We also had sales training documents showing the implementation and manipulation of the schemes, and we had call notes that documented the messages that were delivered to doctors. Where is the causal chain to the actual fraudulent claim? The causal chain, Your Honor, is the enormous off-label marketing messages that Solvay had under the causation standard of the SCA, as we understand it, where the conduct of Solvay was a substantial factor in inducing the submission of the claims. I mean, the problem that you have is that Medicaid won't pay if it's not on the formulary or the compendium, okay? And for there to even be any claim, there has to be a doctor prescribing. Your basic theory is that Solvay has brainwashed all of that process. And you have very little to back that up. These call notes seem like the doctor brings up, oh, I've got this kid who's autistic or something, and the sales rep goes, oh, lovely. And then, oh, my God, off-label causation, there's a prescription. It just seems like if you did have this nationwide terrible scheme, you would just have better evidence than you have after 15 years of litigation. It's a little bit startling to me. We had a lot of evidence. It wasn't 15 years of litigation, Your Honor. I thought you filed in 2003. But the case was under seal from 2003 to 2010. That's when it was unsealed. Okay. We still had a lot of evidence showing. You had five years of litigation. I mean, you've had many, many, many years of litigation and investigation in whatever issue you have. And it seems to me that what you've got is a bit of a whimper here. I mean, these call notes, even if you take the question is not hearsay and all that, really don't show us much. They don't really tell us. Because, honestly, it's not off-label marketing for a doctor to say to a sales rep, guess what, I used your product well on a stomachache. You know, if it's an OCD drug and I used it to cure my client, my patient's stomachache and the sales rep goes, great, that's great to hear, so happy that worked. That isn't off-label marketing. But what is off-label marketing is when the sales reps go to the doctors with an off-label message that has not been approved by the FDA. What they're doing is they're going around and circumventing the FDA requirements that the drug be a medically accepted indication. Yeah, but you have this problem. You have a couple of problems here, and one of them is that the doctor can prescribe off-label. Another one is that Medicaid can and will reimburse off-label uses as long as they're on the compendium. So that's a problem for the notion that necessarily the off-label marketing causes all of this. There's also this other fact that you have the doctor prescribing who has an independent obligation to take care of his patient or her patient, and you have the fact that if you wanted to just follow what the FDA has approved, Medicaid shouldn't approve any of these payments. We wouldn't have any false claims because we wouldn't have any claims. Your Honor, if all this was true, why would Solvay bribe the doctors to prescribe the drugs off-label? That's the kickback part of the element of the case. They're not all just getting Medicaid. There's also private insurance. There's also private pay. Yes, there's also private insurance and private pay,  I understand that. But there was a tremendous amount of evidence that our experts, Dr. Rosenthal in a report, our economists for marketing, talked about the schemes that Solvay employed, and it's a fact issue for the jury to decide ultimately whether or not the conduct was a substantial factor in inducing the submission of the claims. Was it reasonably foreseeable? Solvay knew exactly what they were doing. These drugs were not going to be able to compete in the marketplace. There were too many other competitive drugs out there. They needed to come up with a scheme whereby they could increase their sales. Counselor, let me ask you a question about a source of evidence in this market and what we have here. We know from other cases that mining prescription data is a billion, multi-billion dollar business. Every prescription that's written is now in digital form being bought by a mining company that in turn sells those to the pharmaceutical houses. And then downstream they spend a billion dollars a year in detailing, using this particular mining data to sell and market their product to doctors, physicians. Now, I'm not making judgments about the wisdom of any of that. I'm describing an industry that's known to us in the First Amendment challenges to that practice and other contexts. Now, that's a huge reservoir of information about relationships between the pharmaceutical house and particular doctors and detailing and how they allocate their resources, et cetera. And I just don't know to what extent that is accessible in litigation such as this or not. But it just strikes me as kind of an elephant in the room because there's an awful lot of information out there. There is, and there's a lot of information we got from Solvay that basically admitted it. I just don't know your record, and I don't know what to help me with a little bit of that. We got a lot of information from Solvay that detailed not only what they were doing, but they targeted certain doctors, and we got the tracking information. So they kept track of it, who they were talking to, who they were bribing. Did it work or not? Were we getting more drugs in flavor? There's nothing inherently wrong with that. The detailing also is one of the techniques that's used in informing physicians about the product itself. So I'm just talking about the kind of information that this generates without characterizing which way it cuts or not. And my question, though, is to what extent that was accessible to you or not. It was accessible to us to the extent we got it and discovered it from Solvay, but the message wasn't a non-label message, Your Honor. It was an off-label message with regard to the drugs that Solvay was promoting. The on-label message wasn't going to get them anywhere. There were too many other competing drugs. They needed an off-label message to increase their sales. Well, of course. Well, it's not acceptable. When you lose your primary protection, the drug goes generic. We know that companies, by detailing and other sales activities in the marketplace, they persuade the public to continue with the brand despite the fact that it's now the generics right beside it at a fraction of the cost. So that's just a reality. It is a reality, but it's not a reality that you try to detail off-label messages and pay doctors for it. I'm not being clear. What I'm talking about is when I look at this and the question, my colleagues did questions here about data and what proof is and causation. I was asking just a layman's question about this industry. All I know is what I learned at courthouse.  And I don't see it. I didn't see it mentioned in the briefing or whatever, resources of how you get a hold of that or if you have it. In other words, Salve is doing what other houses do. They have people calling on doctors to push in their product. But the difference is, Your Honor, I think that it's important in this industry and it's important for the overall representations here that we acknowledge the disasters that could be caused when you start detailing and off-label messaging drugs. I recall reading an article a couple years ago 50 years after thalidomide would happen. That was a drug that pregnant women were using for morning sickness, and it turned into a disaster because of the failing test. I don't want to pull you away from what you want to argue in response to your question on causation. I think I understand your answer, which you don't have that information. We do have a lot of information about this. But not from those sources is what I'm saying. These data sources, the data banks. The data banks, Your Honor, we get information from that helped us see the IMS data that helped us make the conclusions we made in this case and that our expert made. I mean, the problem is I understand the dangers of off-label marketing, although I would say, again, thalidomide wasn't approved in the United States, so it couldn't have been prescribed for anything, and the doctor has to make an independent medical judgment that this use that is off-label is in fact good for their patient having considered whatever they need to consider. But the point is you seem to be arguing really as a policy matter that we need to worry about this off-label marketing, and so we need to allow your clients to proceed as relators under the False Claims Act. But, I mean, the FDA already has their own punishment vehicle. If they think off-label marketing is going on and it's this nationwide scheme and blah, blah, blah, there are criminal penalties associated with that, they can pursue that. You are trying to go from that, which is one world, into a different world of the False Claims Act. And I think this is where the translation goes. It's not do we think off-label marketing is bad and evil and we should all be worried about it, but whether—I mean, Congress has already identified a penalty for that. You're wanting us to take essentially a statute that has to do with something else and fit this into it. And to do that, you've got to prove causation, and this gets back to, like I said, looking at these call notes, I'm going, really? This is your great, stunning evidence? It just doesn't seem that—it just doesn't show me anything. Judge Haynes is not speaking for my colleagues. It's the evidence of the communications with the doctors. But a communication by itself isn't enough. It isn't off-label marketing because it depends on how it came up. If the doctor goes, you know, I just read an article in the New York Times about how everybody's out using XYZ drug for this purpose, that wouldn't be off-label marketing by the sales rep. Off-label marketing is a sales rep comes in and goes, yes, I know that we're only authorized for OCD, but guess what, it also works for the spectrum of including autism. That's off-label marketing, but not just talking to a doctor who brings up some article they read. But we had the marketing materials, Your Honor. Okay, but you haven't tied all this together. You have a blob over here, and you have a blob over here, and you have a blob over there, and you're saying somewhere in here something's wrong, guys, and so we should get to go to a jury. And that isn't how it works. Well, we had a lot of evidence of the different marketing tools that they were using. As a matter of fact, our clients were fired for this off-label marketing. They were told to do it. There were written policies saying don't do it, and then there were the oral policies that said go ahead and do it. And that's why they were ultimately fired because they followed the rules of Solvay of trying to meet with the, to market the drugs and to allow the sales reps to make those communications. They were off-label, and the entire process is tainted. When, for example, in the drug Acyon, when you pay a doctor $100 for every prescription or in the Solvay city for the Acyon drug, when you give a doctor $250 so you can just follow the doctor around and talk to the doctor about your sales pitches, that all goes together about their scheme. Not only was there the marketing tools, but there was the bribes to the doctors. Those two, Your Honor, are very conclusive proof and a substantial factor in getting the doctors to prescribe the drugs. These doctors were doctors who were generally on Solvay's list of the top prescribing doctors. They kept targeting the same doctors because the doctor knew if I'm not going to get paid, you know, I'm not going to prescribe the drugs, so they wanted to make sure they continually paid these doctors to prescribe the drugs and send that message. And the doctor said that we wouldn't prescribe it if we weren't paid? No doctor's going to say that, Your Honor, but as a practical matter, if you're given $250 or $100 and you prescribe the drug, you know, it's... It wasn't that clear a connection, was it? I mean, you have doctors that are getting paid to give speeches. You have doctors that are getting paid to do tests. You have doctors that are getting paid for legitimate purposes, but you're saying it was really for an illegitimate reason. That's a little different. It's all the same as the Colquitt case and the Selgin case out of California. Those two cases were... There's not many cases that have gone... There's several cases that have gone to trial. The Selgin case passed summary judgment. The Colquitt case passed summary judgment and went to trial. Jug Higginbotham was on the panel of the case when it reached the Fifth Circuit. And there's the Park Davis case, and there's other cases that have gone. But if the courts look at the Colquitt case, the evidence they had there and the evidence they had in the Selgin case, we had more. And they went to trial. They passed summary judgment. And we went to trial. They went to trial. And we should be going to trial, too, Your Honor, because there's fact issues in this case. Let the jury decide whether or not Solveig's marketing efforts were substantial. I mean, if you give a campaign contribution to a state court judge in Texas and the next week you win a summary judgment, is that a kickback? Is that a bribe? It depends on... In an isolated instance... I can tell you right now the law is that you need more, and there's a reason for that because otherwise every campaign contribution would appear to be a bribe and nobody could ever be a judge for anybody who ever contributed to them, their opponent, or anyone else. But if you showed that the lawyers making those contributions continually made it to that judge, for example, or continually made it to the whole state judiciary, then you could lead to some conclusion that it was a substantial factor. No, you couldn't, and there's a reason for that. Because simply making a legitimate campaign contribution... I mean, there's limits on the amounts, and I understand that, but simply giving $100 every month and you're still within the $5,000 limit, and then you happen to win a case without showing any greater link, like, here, judge, I'm writing you a check and I expect a little consideration, then you've got a link, but just giving a campaign contribution, not enough. That's kind of what you've got here. But that's legal. You can make a campaign contribution. The law permits you to make that contribution. The law permits you to pay doctors to speak. But not to speak with the quid pro quo. Well, but there's the problem, the quid pro quo. What evidence do you have of that? We had evidence, Your Honor. We had a lot of marketing evidence that our experts put together showing the results of the scheme. Dr. Rosenthal, in her expert report, took all the marketing efforts by Selvey and made conclusions, and she focused it on certain doctors. And she looked at the off-label marketing and the off-label Medicaid data that was available and concluded that Selvey's efforts, it's reasonable to conclude that Selvey's efforts would have led to the entire off-label marketing. Okay, I want to, and I certainly don't want to cause somebody else not to ask a question, but I want to just, you talked about the disclosure issue, and we haven't talked about this. I wanted to ask you about that, on the original source. Yes, Your Honor. And the issue of the voluntary, mandatory, and all that. Let's assume, arguendo, we agreed with you that the meeting on June 9th could be the voluntary disclosure. I have your declaration, and there's a few other people's declarations. Is there any other evidence that I need to look at to know whether, if we sent this back, what would the judge have to consider on whether or not the proper disclosure was made in content? The declarations pretty much tell it all. They don't tell anything. I mean, what you say is we talked about it. Is that enough just to say, look, we talked about, hey, there's off-label marketing of these three drugs. Is that enough? It's enough to say to the agents in a 10-hour meeting that there's off-label marketing that's similar to the language in our complaint. That's the tie. We haven't broken down in the affidavit the detailed extent of the discussions, but it was a 10-hour meeting with the agents. And what about the fact that you're trying to have it both ways? You're trying to be a lawyer who writes a declaration on behalf of his client but then says, I'm not giving you my notes, na-na-na-na-na-na, because those are privileged. Isn't that kind of a problem? I mean, you can't say, I used notes to refresh my recollection, but I ain't giving them to you. Is that not an inconsistency? That's the statutory bind we're in. We have to be able to do this to satisfy the original source requirements. So, you know, if the judge decides we need to turn over the notes, fine, but we have the obligation under the statute to make that voluntary disclosure. And as lawyers, it's not always easy to find somebody else to do it. That statute was in place to do this. This is the meeting you're relying on, but you're keeping them from relevant information about this meeting, and we're just supposed to kind of believe that this wink-wink, this, you know, this is what we mean, is enough to prove that you really did the full voluntary disclosure that's required. I mean, put it another way. If we're going to send this back to the district court to look at, okay, you can consider the June 9 meeting, or you should consider it. I'm thinking, what's the judge going to do with this? This is a bunch of nothing. He could hold a hearing, Your Honor.  So the judge has to hold a hearing. We made a prima facie case that we are the original source. We had the information. We conveyed it. He never even dealt with those issues. He just basically cut us off and said, ultimately, that you did not tell the government early enough. And what case says he has to hold a hearing? I'm just suggesting that it would be a proper interpretation to hold a hearing on it if there's any issues that the court had about the extent of the disclosure. We also had evidence, Your Honor, about that substantiated the off-label fraud scheme of the manipulation of drug decks. Drug decks, the court referred a moment ago, there's two ways that you get the medically accepted indication. Number one, it's approved by the FDA, or two, it's listed in a compendia. We had evidence that Solveig manipulated this compendia by giving the information to drug decks that was only favorable to them. They did small studies that showed the favorable outcome of their results, but they hid from the compendious people larger studies that were registered studies that they were going to have to give to the FDA, but they were failed studies. It's the half-truth that is discussed by the Supreme Court in Escobar, and those half-truths, the court ruled that Solveig had no duty or obligation to disclose anything to drug decks about negative results. You do when you're trying to correct the half-truth. You can tell part of the story and keep from the regulators, or drug decks in this case, hired by the government to list these drugs as whether they're effective or not. You can't hide the true facts, and that's where the second part of the fraud comes into play. Thank you, Your Honors. Mr. Androffi, you've, of course, saved time for a rebuttal through Ms. Frazier. You didn't address the cost issue. I notice you've saved a full 10 minutes for rebuttal. It's totally up to you, but if you want to use some of your rebuttal time to address costs, you may do so or you may retain the full 10 minutes for rebuttal. I better defer to my partner. She'll be not happy with me. All right. But I think we'll stand on the record with regard to that. I'd love to address the cost, but we'll stand on the record. Okay, that's fine. Thank you. All right. Ms. Ellsworth. Good afternoon, Your Honor. Jessica Ellsworth on behalf of Solveig Pharmaceuticals. The False Claims Act attaches liability to the submission of false claims to the government for payment. Despite a decade of investigation and discovery in this case, the relators failed to present the district court with admissible, competent summary judgment evidence that would support FCA liability under any of their theories. In a theme that really continues with their appellate briefing and their argument today, the relators' defense of this case was based on a narrative that ultimately didn't match up to what they submitted as evidence, and the evidence they submitted was problematic in its own right. Judge Miller acted within his discretion in making evidentiary rulings, and he properly granted summary judgment. Okay, but we just came out with a case, Lee v. Offshore, that made it clear that in 2010, Rule 56 was amended to not require that the summary judgment evidence be itself admissible, and the objection would be that it couldn't be put in admissible form. That's the objection that has to be made, and the judge has to find it can't be put in admissible form. In that case, it was a writing from an expert, but it hadn't been sworn to, and we said, well, that still needs to be considered. Is it your contention that the necessary data cannot be put in admissible form? Yes, Your Honor. Explain that. And I think there are a number of layers that are important to understand in that argument. So the first question that I think Your Honor is focusing on is, could the district court have properly excluded this declaration under Rule 37 because the declarant, Kevin Raymond, wasn't properly disclosed? Because the way the relators are suggesting they could bring this in at trial is through someone who actually can't testify. He wasn't disclosed. The four-factor test that this court applies in determining whether a district court acts within his discretion in excluding a witness is satisfied in this case. All four of those factors support the reason that the district court reached. The second problem is that – I mean, actually, Rule 37, which has been amended since our early cases on this, itself says that it's supposed to be excluded unless the failure to disclose was substantially justified or harmless. I mean, it's actually a different standard than the original case that said about the four factors and blah, blah, blah, to tighten up Rule 37. But, okay, tell me about the four factors anyway. Well, I do think the four factors are the same ones this court has continued to apply in examining whether a failure to disclose was substantially justified or is harmless. And the first factor is the explanation for the failure to disclose. The relators have never offered an explanation. They simply didn't apparently seek this authentication information until after – four months after fact discovery had closed. And that was despite the fact Solveig had been asking about this data. And how long was the case inactive? I mean, because he's saying, well, it's really not been in litigation since 2003. You've been frozen and this and that. How long was it in inactive litigation at the point of the nondisclosure, if you will? I mean, how many years had they had to disclose? So the data was first produced, I believe, in 2013. And at that time Solveig began asking questions about it because this data that was produced as TXT and Excel files with no additional information gave no – nothing about it identified where the source was, how it had been manipulated, how it had been augmented. It didn't match up to anything Solveig could determine would have been material that was in front of the Texas Medicaid based on the pharmacy claims data. So Solveig began asking about that. Solveig served an interrogatory – Solveig began by writing letters. It then served an interrogatory. It then moved to compel. At the motion to compel, the magistrate judge who heard it specifically warned the relators that if there was information that was missing, Judge Miller might hold that against them. And that is, in fact, what ultimately happened when they continued to refuse to provide an authenticating witness. And this was important because this data included diagnosis information that was not in a pharmacy claim form. It came out at the hearing that the relators had hired two other individuals, a man named Tony Morrow and a woman named Karen Carban, to do some sort of matching exercise where they took pieces of data from one data set and pieces of data from another data set and attempted to combine them. As the district court pointed out, that matching exercise wasn't disclosed in any of the declarations that were belatedly submitted. And on appeal, the relators aren't even arguing about the exclusion of Morrow or Carban. This becomes particularly important because the summary judgment evidence that they submitted consisted of summary charts, and the information in those summary charts was drawn from the Carban and Morrow spreadsheets. It didn't come from anything that they are now saying Kevin Raymond could authenticate. And you can see this by looking at Sarah Frazier's declaration that she submitted in connection with the surreply in paragraph 3. That can be found at ROA 57432. So the information that was in the summary judgment record came from manipulated Excel spreadsheets that the relators are not disputing was not properly authenticated and are not contesting the exclusion of the individuals who put together that information. Stepping back, it seems like their whole case is kind of like, We, the relators, have proved this nationwide evil off-label marketing scheme. We have proved that doctors prescribed medicine for off-label uses, and we have proved that Medicaid paid for some of that. We're done. Why isn't that good enough? That is certainly the narrative that they tell, Your Honor, but that narrative does not match up to the evidence in a number of ways. And if I could just take a step back to start with the scheme evidence. Relators are essentially asking you to be the first court in the nation, appellate court in the nation, to ever hold that a relator doesn't need claims to go to trial. This court, though, has said specifically that liability under the False Claims Act attaches to a claim for payment, not to underlying noncompliance. And it has specifically said that the False Claims Act is not a general enforcement device for ensuring policy compliance with obligations like off-label marketing programs. That was my exchange with them about, you know, the FDA can still go after Solveig if they want on this same exact nationwide scheme. That's correct, Your Honor. And in this sense, I think the Booker case from the First Circuit that we provided in our 28-J letter is very relevant because what the First Circuit explained is that the district court in that case, much like the district court in this case, did not need to address the scheme evidence because even if there is scheme evidence, and I don't agree that there is in this case, but even if there is, unless that scheme evidence is actually connected causally to claims, a relator can't go forward. But, I mean, they're saying it's connected causally because you do this massive marketing, you bring these doctor sandwiches and you pay them for this and that, and you follow them around and you harass them as part of this nationwide scheme to do off-label, and then they prescribe off-label, some of which is going to be paid for by Medicaid, and you know that. Why isn't that good enough? That's their argument, that you know that your action is causing these prescriptions. In total, I mean, some that are private pay, some that are private insurer, some that are something else, and some that are Medicaid. Why isn't that good enough if you know that the effect, and in fact, the purpose of your off-label marketing is to get more prescriptions. Some of those are going to be Medicaid. Why isn't that good enough? Your Honor, every appellate court to have addressed this issue has said that it's not good enough. In addition to the Booker case I just mentioned, the Third Circuit case that Booker cites, which is U.S. X. Rel. Quinn, makes the same point. We argued to the district court U.S. X. Rel. Cruz, C.R.E.W.S., which is a Seventh Circuit case that reaches the same conclusion, and the Ninth Circuit has reached that conclusion in the Affletuni case, U.S. X. Rel. Affletuni. The relators have relied here in part on suggesting that their case is like the Celgene case from the Central District of California, but you can tell just by looking at the block quote on page four of their reply brief that their evidence is nothing like the evidence in that case. In that case, the relator had information about physician prescribing rates and how they had changed based on marketing context. There is nothing similar in this case. The relators also had evidence of hundreds of thousands of claims for non-reimbursable prescriptions, and, of course, these relators have no evidence of any claim that is for a non-reimbursable prescription. See, what I'm trying to understand on that front is I don't understand, in a way, putting aside the issue of the off-label causing it, I don't understand how you really could have a false claim because either it is for an FDA-approved diagnosis or it's for a compendium-approved diagnosis, we'll use that phrase, in which case then Medicaid will pay, or it's not. So if somebody prescribed, you know, AC on for a stomachache, Medicaid wouldn't pay for that because they'd say, no, that's not on the compendium, that's not FDA-approved, you're out of here, so there would never be a false claim paid. So I guess what they're trying to say is that in making the claim in the first place to Medicaid, they're saying we did everything lawfully and that by the nature of the off-label marketing, that's the unlawful link. And what's your answer to that? Well, I just want to back up one point on the premise of your question, Your Honor, because when a claim is submitted, and I think this is why the diagnosis information becomes so critical and how it was injected into this data becomes so critical, the claim doesn't identify the diagnosis for which it's being submitted. So when the claim is presented to Medicaid, Texas Medicaid, Texas Medicaid will pay the claim without knowing whether it was written for depression or a stomachache. Oh, okay. So this is why the diagnosis information and the matching exercise that they apparently attempted to do through these undisclosed witnesses became so important. If the doctor is prescribing it for the stomachache and it's not on the compendium, then the doctor is the one committing the false claim rather than anybody else. I think that's right, Your Honor, and that's where the causation evidence would become so important that also they are lacking. They would need to be able to show that the reason the physician wrote that claim for the non-reimbursable use was somehow the result of Solvay's marketing activities to that doctor. The only thing they sought to use to establish that causation was call notes. And as Your Honor has already pointed out, these call notes are very cryptic call notes that frequently have absolutely nothing to do with and on their face make no reference to the ultimate diagnosis that the relators are saying the claim was submitted for. It's a larger point because I'm actually disturbed by the idea that a doctor can't talk to a sales rep about what the doctor is experiencing because that's actually very important. For example, if the doctor had prescribed it for a stomachache and the person had a terrible reaction, the doctor should definitely tell the sales rep that. They should definitely report it to the company, and that should be something that they become aware of. The idea that any time anything other than the FDA-approved use of the medicine is discussed by the doctor, the sales rep has to run out of the door screaming with his ear covered is worrying to me because the whole notion of this is that you do learn how doctors are using it, and that can, first of all, lead to more FDA-approved indications and also lead to contraindications and warnings where necessary. We agree, Your Honor. I know you will agree with that, but it's a point that hasn't really been made. When we're going to delve into policy, that's part of the policy. I think it highlights that one of the problems with the way relators tried to use call notes is their sole basis for causation. They didn't actually go out and depose sales reps to get information that they then could have used to provide a clearer narrative about what was happening during these interactions and what the sales reps were saying about causing physicians to take certain actions. They just didn't do that. So to be clear, I think there are at least five ways that this court would need to conclude that the district court abused its discretion or erred in order to reverse its ruling on the off-label marketing. The first, as we've been discussing, is the exclusion of Kevin Raymond's declaration under Rule 37C. The second is the fact that the district court made the evidentiary determination that his declaration didn't authenticate the Texas data in any event, so even if he were to allow it, there was nothing in it that linked Mr. Raymond's declaration to anything in the summary judgment record. His declaration didn't identify even the drugs. It didn't claim personal knowledge of any query that was run. It just referred to this ambiguous query being run. And, in fact, the query was run by a contractor of Texas Medicaid who was not Mr. Raymond's employer, and there was no one who submitted a declaration from that entity. You would also need to find that the district court abused its discretion in finding that the summary charts did not satisfy the evidentiary standard under this court's Rule 1006 case law for summary charts. You would need to find that the district court abused its discretion in excluding the hearsay from the call notes, the doctor's statements that we've been discussing, and you would need to find that the district court erred in finding that the examples the relators relied on did not create a genuine issue of material fact as to whether Solvay caused the false claims to be submitted. We think all of those reasons, and they would need to run the table. I want to be clear. They would need to run the table that all of those things occurred incorrectly in the district court in order for there to be a reversal of their off-label promotions. What do you do with the bribe idea that it seems like doctors are getting paid for stuff that, you know, it's sort of questionable why that payment's being made other than to get them to prescribe the drug? How do you respond to that? So I have two threshold points I'd like to make on the kickback theory. The first is that their kickback theory depends on the claims data being admissible. So if this court concludes that either because Mr. Raymond was properly excluded under Rule 37 or he didn't authenticate the data anyway, that the data doesn't come in, it can affirm the kickback ruling on that basis. The second point I want to make about the kickbacks is that all of the examples they are including in their brief to this court are new ones. They aren't examples that were provided to the district court with one exception, and that is the reference to speaker programs. And in the reference to speaker programs, they suggest to you that they have identified a tracking document that tracks the impact of speaker events. I would encourage the court to look at the record site for that document. It does no such thing. It is a list of doctors. I do not have the record site right in front of me. It is a document that is cited under their description of Lubox speaker programs. And it does not suggest, as they say in their reply brief, that the speakers, the four speakers they've identified were top prescribers of the drug in any event. It refers to those doctors as being in the seventh and eighth decile. It is a report about doctors in the seventh and eighth decile. So that is the only kickback allegation they're making to this court that was made below. On that, the relators are flat wrong to suggest that any evidence of payment to a provider automatically equates to an anti-kickback statute violation. That's not true. Was my analogy a decent one about the campaign contribution, or is there a flaw in that analogy? I think your analogy was precisely on point, and it's the very point that this court made in its decision in U.S. XRL Russia versus Omnicare last fall. The court specifically distinguished between a situation in which evidence shows that a program was designed to induce these type of prescriptions to federal program participants from a program where perhaps you could infer there was some hope on the part of the defendant that the doctor might light their drug and might write more prescriptions. That hope is not enough, and in that case, the district court affirmed a ruling on the anti-kickback statute theory of false claims act liability on the basis that there was no evidence of an intent to violate the anti-kickback statute. That ruling, I think, applies with force here. This is simply not a case where the court was being asked to weigh evidence. There was just no evidence of intent of any kind. So in addition to sort of all the waiver problems and also the record problems, the relators have suggested to you that some of these programs were about payments of $100 for prescribing a drug to a doctor. Again, I would encourage you to look at the record, because there's nothing in the record that supports that assertion on any of the record pages that they cite. And so this, again, as I mentioned in my introduction, their narrative does not match up to the material that they cite. This was a consistent problem that Solvay faced in the district court. You can see in a number of the district court decisions that the district court was focused on that being a real credibility issue when it came to understanding what the evidentiary support for their allegations are. There is no evidence of a quid pro quo. On the original source question, if I could turn to that briefly, because it came up in the earlier argument, there is no need to send this back, even if the court disagrees with the idea that the voluntary disclosure and the mandatory disclosure could essentially be the same thing. We think the district court was correct in pointing out that there are two different statutory provisions, one that governs mandatory disclosures and one that governs voluntary disclosures. As a matter of statutory interpretation, when something is set out as- What if we were to disagree and say the June 9 meeting could be the voluntary disclosure? Then do we have to remand or could you still win? I think we still win for a number of reasons. The first reason is that they did not-it was their burden to demonstrate that jurisdiction was proper. It was their burden to demonstrate under the Supreme Court's decision in Rockwell that jurisdiction was proper on a claim-by-claim basis. And they didn't meet that burden. The relators themselves did not testify about the content of any pre-filing disclosure that occurred. None of the declarants provided any content either. This is important for a couple reasons. The first is that their original complaint looked nothing like the fifth amended complaint that they were ultimately litigating. They added a number of new theories about drug dex, about P&T committees. They added a number of new off-label promotion schemes. They added a number of kickback schemes. So they would need to have documented an evidentiary basis for the district court to conclude that each of those were disclosed. What they did- If just some were, then would you get a remand and some of that should be allowed to proceed and some shouldn't? I think the First Circuit, in the recent Booker decision, I think has a useful concept for thinking of this, which is that at the summary judgment stage, it's the time to put up or shut up. They had their chance to provide any evidence they could, documenting the content of those disclosures. Solve had made very clear from the time that it sought the disclosure statements. And it moved to compel them. And it told the district court in that motion to compel that it sought to compel them because it wanted to raise a jurisdictional argument. And so the relators were on notice from very early on that the content of any disclosure was going to be important. They have chosen-they chose not to provide that. They didn't have either relator put in any declaration identifying the content. And they rely on this conclusory assertion from Mr. Androphy that, of course, is based on privilege notes that they are not sharing with anyone, suggesting that there was some discussion of kickbacks and off-label promotion. But, frankly, that's not enough. And the U.S.- What would be enough? What are we looking for here to be the evidence? Again, assuming the June 9 meeting could be the voluntary disclosure, and I know you disagree with that, but if we assume that, what are we looking for? I think what you're looking for-so in many cases when a relator does a voluntary disclosure, they actually-they put it in writing. So one of the things you might look for is some sort of contemporaneous writing that identifies what they said to the government about which off-label promotion schemes they're saying were at issue for Androgel. Are they saying this is about, for example, promoting Androgel for stomach aches? Or are they saying this is about promoting Androgel for depression? If so, what did they say to the government about those things? The branch consultant's case from the Eastern District of Louisiana walks through why the content is so important. That case is analogous to this one in the sense that the relator had named many, many defendants. And the question was, which of those defendants were identified in the voluntary disclosure? It turned out a number of them weren't. And so as to those defendants, the relator could not be an original source. Similarly, in this case, the relators are trying to pursue a wide variety of off-label marketing allegations about different conditions and a wide variety of kickback schemes. So the voluntary disclosure documentation would need to identify which of those had, in fact, been presented to the government. What about the argument that they've put in enough to allow for an evidentiary hearing, and that's where they would put on this more detailed evidence? Your Honor, I think the Jamison case from this court makes clear that summary judgment is the time to put that evidence in. There's not any suggestion in the statute that there is supposed to be some other sort of evidentiary hearing. The relators were entitled to put in declarations from the two relators themselves. They were entitled to present written documentation about the content of that. They were entitled to have Mr. Androphy specify in detail, if he wanted to speak on the relator's behalf, what those disclosures were, and they chose not to do that. In fact, in their reply brief, I think it's telling that they say the only content they needed to disclose was Solveig's name, Androgel's name, and the phrase off-label promotion and kickbacks. That's not the law under Rockwell. It's not the law under this circuit's case law, and it's incorrect. The other thing I'd like to point out about public disclosure is they are only defending their original source status as to off-label marketing and kickbacks. The off-label marketing and kickback allegations have independent flaws. The kickback ruling that the district court issued specifically out of an abundance of caution addressed Androgel as well. So to the extent the court is affirming the kickback ruling on Androgel, and the relators have raised only one issue about Androgel in their brief, and that relates to speaker programs about Androgel, to the extent the court finds no evidence of intent as to those speaker programs, it can affirm as to Androgel kickbacks on that basis. Putting aside the original disclosure. Okay, what about the off-label? Putting aside. On off-label. It's the same claims data stuff. It's the claims data stuff. And again, that claims data stuff would apply to the kickbacks as well. So we think there are, even on the original source question, a number of layers to the analysis, and the relators would have to run the table on all of them again in order for there to be a conclusion that their Androgel claims should have gone forward. If I could mention briefly drug decks. The district court correctly found that there was no evidence linking their theory of improper publication strategy or ghost writing to anything that ever appeared in a drug decks monograph. And a monograph is essentially the information that drug decks puts together about specific drugs. There was no evidence that Solveig Ghost wrote a publication that appeared there, and there was nothing fraudulent about Solveig sponsoring one kind of study over another when the studies were very clear on their face as to how they were conducted, what the methods were, what the findings were, and there was no suggestion from relators at any point, and certainly not in this court, that there's anything about the way the study is reported that is incorrect. Can drug decks ask a pharmaceutical company for studies that haven't been published before deciding about what to put in the compendium? I don't know why drug decks couldn't ask a company for that sort of information. Drug decks, the evidence below showed that drug decks maintains clinical specialists whose job are to evaluate study information. They have internal and external review boards that they use to make determinations about what to say about studies and what sort of scientific weight to give those studies. The relators have distorted the factual record about Solveig and drug decks communications in their brief to this court. The evidence was that there was no communication between drug decks and Solveig about any study, Luvox or otherwise, and instead the evidence thoroughly documented drug decks' independence from pharmaceutical companies and how it makes decisions about what to include. There was an issue that came up in the district court where the relators had suggested that a number of the studies that appeared in drug decks were not publicly available in the United States, and so they must have come from Solveig, but in fact, as the district court noted in a footnote of its drug decks ruling, Solveig went out and found multiple libraries in the United States that had that study information, and certainly drug decks could have gotten it from there. The relators have suggested that Escobar somehow changes the way that their drug decks theory should play out, but that's incorrect. Escobar is an implied certification case. It involves situations in which a defendant is impliedly certifying compliance with some sort of underlying statutory or contractual obligation to the government when it submits a claim. Solveig, first of all, did not submit any claims to the government. So would the argument, though, be here that the doctor is impliedly, you know, the doctor on behalf of the patient, I guess, by sending in the claim, is impliedly certifying that the doctor wasn't influenced by improper off-label marketing when, in fact, the doctor was? Well, the relators raised Escobar only as to their drug decks theory, and their drug decks theory is to... So that's influencing drug decks to approve something on the compendium that shouldn't have been approved. That's right. But it's the half-truth argument. It's the half-truth argument. But when you look at the evidence, and there's no evidence that Solveig provided any information to drug decks, there's no way that evidence could have been a half-truth because there was no such evidence. When you look at the fact that the studies that were, in fact, published in drug decks were accurate in describing their methods, their conclusions, who the participants were... I mean, drug decks is not supposed to just take the pharmaceutical company's word for stuff. I mean, that's part of this whole overall process of approving drugs in general is that you recognize the pharmaceutical company's self-interest. That's exactly right, Your Honor, and that, I think, is why drug decks, like the other compendia, maintain these clinical specialists whose job is to review the scientific weight to give study publications. They don't communicate with pharmaceutical companies, and there was no evidence that they had communicated with Solveig about any study that they ultimately published. So for all of those reasons, Escobar doesn't do anything to advance the relator's drug decks theory. Escobar also does something else that's highly relevant in this general area of quick-time actions, and that is his insistence upon materiality of the underlying materiality, that is, that the government was itself misled, and that whatever may be the characterization of the underlying conduct, that the government itself accepts it, is aware of it, then there can be no such claim. How does that factor in, that standard factor here, where you don't have the claims payment system, which would normally get in the quick-time action? So particular to the drug decks theory, I think the materiality analysis shows the many missing links in the relator's theory. They have not identified anything in drug decks that they say would have been published differently. What about the claims that are made here are unknown to the government? That is, in a sense, ultimately what happened is that the government is going to have to demonstrate that the government paid out money. That's what this statute is about, nothing more. That's correct, Your Honor. Now, we've been talking about everything, but what about the government's role in this? I just wonder what do we do with the eschewar insistence on materiality? How do you handle that in this kind of context? I think the relators would have had to show that the government would have made different decisions about paying for claims if there had been different— The premise of that is that the government did not know when it made the payment. So what we're talking about here is a public campaign, essentially, to persuade. So I think that if the government had known that drug decks was publishing different information and the government had become concerned that it was seeing a surge in AndroGel scripts that were written by a particular type of doctor who wouldn't have any reason to prescribe for compendia or on-label reasons— They did elect not to go forward, not to join, but would you have any further action from the government about the dependency of the suit or their role in it? No, that once the government declined to intervene in the case, they did not participate. The government does say that. So, yes, that's the structure of the statute. But I'm trying to get the very potent medicine of Escobar into this kind of a lawsuit because that's the ultimate inquiry here. The whole purpose of this is to supplement with private resources the protection of the government against being a fisk and people ripping them off. We agree, Your Honor. But the relators, of course, could only raise Escobar in the drug decks context because they had a variety of other evidentiary and other problematic issues with their support for all of their other theories that didn't even allow them to get to a discussion about what Escobar might mean in those contexts. For all of the reasons we've been discussing, we would ask that you affirm the judgment the district court entered on behalf of Solvay. Thank you very much. Thank you, Ms. Ellsworth. Ms. Frazier, you've saved time for a vote. Thank you, Your Honor. What do you do with Booker? First Circuit of 2017. Booker presents a very important issue for this court. It's actually incorrect that this court would be the first to find that claims were not an essential part of an off-label marketing or False Claims Act case. Brown v. Selgin already did find that and relied on Al Flatouni in doing so. So Booker sets up a conflict between the circuits on this important point of whether there is, in addition to the normal elements of the False Claims Act, that is, intent and materiality and falsity and causation, in addition to all of those, there is this tacked-on additional element that one has to have evidence of at least one specific False Claim. And that's what Brown v. Selgin rejected, but Booker adopted. And you can look at the reasons why those circuits went opposite directions, and that is both of those decisions flowed from the Rule 9b jurisprudence in those circuits. And so, for instance, with regard to the First Circuit, the Rule 9b jurisprudence, including Duxbury and earlier cases, has always actually required a specific False Claim to be shown, a representative example usually is put at the Rule 9b stage. It's never been the case in the Ninth Circuit. It's also not the case in this circuit where Grubbs has long governed this area and adopted a flexible test where you do not have to have necessarily specific False Claim details alleged, but instead you need to be able to show detailed schemed evidence and other reliable indicia. Well, how would you calculate the averages? How would you calculate the quantum, how much money did the government pay out as a result of the fraud? We did so using an expert economist, Dr. Meredith Rosenthal. Can you give me something more concrete than you can get an expert to swear that's the money you owe? Yes, Your Honor, but I need to preface that by saying that damages under the False Claims Act are not part of the summary judgment because nominal damages and penalties are sufficient to get to trial. That may be, and I'll give you that, but that's not the thrust of my question. You're asking how you prove the damages sheds light on whether there is a causation, right? In other words, before you get down to calculating, ask a jury to determine how much money paid in cash would compensate the United States government for the money that you have earlier found it was defrauded of. Now, what do you base that on? You don't have claims. You ought to come up with some quantum of claims that are infected. So, Your Honor, these are separate analyses. Liability, that is causation on the one hand, and damages under our expert report. And the damages are calculated based on – they're really – they make no attempt to be all of the damages that were actually caused by the marketing because of the nature of the fraud, it's not possible to capture those. And as was said earlier, the diagnosis is not even part of the claim. And so the piecing together on an example-by-example basis is really not possible. So instead, what you do is you look at – and we have the Medicaid utilization that is off-label. And then of that, you do an expert analysis as to what proportion of that you would expect. You look at what data for Medicaid? You look at Medicaid payments for this particular drug? I'm sorry, what was the question? You look at Medicaid prescriptions that were paid? Yes, Your Honor. Okay. For this particular drug. That's a starting point. Yes. And we have the – I should say that we have that regardless of how the court rules on the Texas claims data. That is available in other routes publicly, and both experts used that data. Let me ask a really basic question. In your opinion, is the claim false because there was off-label marketing that may have influenced the doctor in his or her practice of medicine, or is it false because medicine was prescribed for a use that Medicaid would not otherwise pay for, if they knew all the facts? The premise is that Salve caused the claim to be submitted to Medicaid, even though it was not reimbursable. But the not reimbursable means it's not on the compendium. That's right. So have you shown us that? I mean, in other words, have you shown us that doctors are prescribing these drugs for uses that are not only not FDA approved but not on the compendium? Absolutely, Your Honor. Okay. So talk to me about that. What uses are not on the – because your whole thing with drug dex is you got this put on the compendium falsely, but that would mean it's on the compendium. So then if the doctors are prescribing it on compendium, then it's not a false claim. So I'm trying to understand, what are doctors prescribing this for that's not a compendium or FDA approved that they are then submitting to Medicaid and Medicaid is then paying for that Medicaid wouldn't pay for if it knew all the facts? Doctors prescribed Luvox for a host of indications outside of obsessive-compulsive disorder in children, and none of those are covered under the compendium. That's very important. That really kind of got lost on me in the translation, but thank you for clarifying that. And, Your Honor, I know that it's such a detailed record, but the record does contain lists of compendium. Let me say this. This might be the easiest. Everything that we address in the 108 representative claims deals solely with non-compendium uses. Okay. All right. Now let me ask this. If Medicaid is so concerned about paying only for drugs that are either on the compendium or FDA approved, why are they not asking for the diagnosis when they pay the claim? So Medicaid is a state-by-state program, and the question is, it's the pharmacy that submits the claim. And there's never been a practice in the medical industry of the pharmacy being told by the doctor specifically what the drug is for. But, you know, okay, so if I go into CVS to get a drug, I also have gone to Dr. X to be treated, all of that's going to the same place, Medicaid, an insurance company, wherever. If they were interested in that, they could put that together. The fact that they're not putting that together or asking for that, does that go to the materiality point that Judge Higginbotham raised? If you don't ask for something, then how can that really be material to you? You can put together a few examples, and it does take a while to do. And that's, in essence, the project we took on for summary judgment basically because the judge asked us to, although we think that the best evidence of causation is actually looking at the larger scheme and the economics of that and all of the things that Dr. Rosenthal considered in her expert report. But no Medicaid agency can actually compile all of the instances of that happening. In fact, it's not that easy even to put together a pattern on it. It's precisely why we have the False Claims Act. And it's important to say that some of the most important False Claims Act cases have been in the off-label marketing area because there is no other remedy that really works. But then all of these doctors are violating the law. No, Your Honor, they're not. This is essentially about deceptive marketing. It's about the companies circumventing the— I mean, the doctors can know whether something—the compendium isn't a secret. They can know whether it's on the compendium. They can know whether it's FDA-approved. And they can know that if their patient's on Medicaid and they're sending them to—they're prescribing a drug that's not anywhere approved for Medicaid, either on a compendium, FDA, anywhere else, that they're violating the law. The law is targeting deceptive marketing, Your Honor. When doctors have involved themselves in that, then they have sometimes been criminally prosecuted. That's true, but ultimately you're going to—if you'll think in terms of Rule 49 of the Federal Rules of Civil Procedure, what are you going to ask the jury? And that brings down a lot of abstract and theories to the reality of what's going to happen at trial of this lawsuit. You're going to finally ask them what sum of money would—how much—what sum of money, paid in cash, would compensate the government for the fraud perpetrated upon it. Now, I don't have yet an answer to how you calculate that other than these very general statements about you're going to somehow or another have an economist come to a number based upon their study's quote of the marketplace. That's why I said earlier to you that that really is another index to questions of causation, which is very troubling to me about your case. And I wanted to tell you that forthrightly so you can help me with it. So I'm happy to address that, Your Honor. And if I have been vague, I assure you that our expert report has been very specific on this, but I'll try to give an example that might assist. For LUVOX, LUVOX has a very narrow indication of obsessive-compulsive disorder. This was not a very common disorder. It wasn't even in the common parlance at the time as much as it is now. And it was not the domain of primary care doctors. It was very much the sort of thing that you would refer a patient to a specialist for. And so one of the things that you look at when you look at damages is the efforts within primary care to market a drug, which is really a specialist drug at the time. Somebody's going to have to quantify how many prescriptions were fulfilled for a misuse of the drug, an impermissible use under the statute. Well, we can give you a proportion. You've got to get there. You don't have a lawsuit. I mean, you may have a policy argument, but you don't have a quick timeout. And, Your Honor, we have very specific numbers attached to these, and they are based on – let me back up a little bit. So in the analysis done by our expert, one of the tools at her disposal was a product by a vendor named IMS. It's called NDTI. And this product allows us to see – for the doctors in this sample, after they have a sales visit, they immediately write down what they remember about the promotions that they heard. And based on that, you can develop an economic analysis of the proportion of prescriptions that are coming out of off-label promotions. And if you look at Luvox and Androgel, it is majority off-label. And so that analysis has been done. And our expert is preeminent in this area, and pharmaceutical economics is what she does. So she has found numbers that accord – that relate to these observations. So – All right. Thank you, Ms. Fraser. Your time has expired, and your case is under submission. Thank you. That's the case for today. Hills v. Energy Operations.